PALMER et al. v. LANSBURGH.

(Circuit Court, D. West Virginia. May 31, 1900.)

1. ADVERSE POSSESSION—POSSESSION OF TENANT—EVIDENCE—ACTION TO QUIET TITLE.

Proof of possession of land under color of title for more than 10 years by roving squatters as tenants, who were told to remain on the land, to cut and build where they pleased, and to hold possession for plaintiffs or their testator, or to stay on the land until turned off by plaintiffs, but with whom no definite agreement was made as to their tenancy, and some of whom either repudiated the rights of plaintiffs, or told contradictory accounts of their possession, when taken in connection with evidence of possession by tenants under written lease from plaintiffs for 5 or 6 years, with one formerly in possession under claim of independent title, is not sufficient to show such open, notorious, and continuous possession for a period of 10 years as will give title by adverse possession.

2. QUIETING TITLE—ILLEGAL DEED—CHAIN OF TITLE.

A deed which is illegal, but not void, is not sufficient to invalidate the title of one holding by an otherwise regular chain of title from the patentee.

Holmes Conrad and David E. Johnston, for plaintiffs.
E. L. Buttrick and S. L. Flournoy, for defendants.

JACKSON, District Judge. This is a bill filed by the plaintiffs to remove a cloud upon the title of the testator to 15,000 acres of land lying and being on Panther creek, and the waters thereof, in the county of McDowell and state of West Virginia, conveyed to John Handley in his lifetime by E. C. Fuller and wife and by Edward L. Fuller and wife, by deeds bearing date April 22, 1886; and it is alleged that the Fullers derived title through various intermediate deeds from Minard W. Wilson, and that they also claimed that Wilson derived title from one James W. Everette. It appears that John Handley departed this life on the ——— day of ———, 18—, in the state of Pennsylvania, having first made his will, which was duly probated in the state of Pennsylvania, an authenticated copy of which was recorded in the clerk's office of the county court of McDowell county, W. Va.; that up to the death of the said Handley he was in the actual possession of the 15,000 acres of land under his deeds therefor, and that his executors, since his death, have continued in the actual, exclusive, continuous, notorious, uninterrupted, adverse, and peaceable possession of the said 15,000 acres for more than 15 years prior to the institution of this action. It is further alleged that a deed made by P. R. Spracher, commissioner of the circuit court of Tazewell county, Va., conveying 50,000 acres of land to

Max Lansburgh, which, it is alleged, covers the land in controversy, "is illegal, but not void, but gives color of title to the said Lansburgh." The plaintiffs also introduce a deed from James W. Everette to Wilson, as a part of the chain of title that they rely upon, but there is no allegation in the bill which tends to connect the title of Everette with the commonwealth; and the deed under which Everette claimed was held by the circuit court of McDowell county to be a forgery, and by a decree of that court was canceled and annulled, thus destroying the chain of title derived through Everette. The other allegations of the bill it is not deemed material to notice. The plaintiffs must rest upon their bill, and the chain of title which they have set out therein and rely upon. Their title commences with one E. L. Fuller, who, it is alleged, was the owner of the tract of land in controversy, and in the year 1888 placed W. Taylor Payne and other tenants in possession of this land or certain portions thereof. In 1883 Fuller sold and conveyed this tract of land to John Handley, who recognized the possession of the tenants that Fuller claimed he had placed on the land before he sold it to Handley. The defendant, in his answer, claims a regular chain of title from the commonwealth of Virginia, by patents issued to Robert Morris on March 4, 1795, for 320,000 acres, and March 23, 1795, for 480,000 acres, and that by mesne conveyances he holds a regular chain of title from the patentee down to himself. The only question in this case is one of an adverse possession under color of title claimed by Handley's executors to have been derived from the two Fullers.

Daniel H. Harman testifies that Taylor Payne, Henry Allen, and James L. Payne were placed in possession of the 15,000 acres in 1880 or 1881 by the agent of Fuller, who conveyed this land to Handley, and that the same parties were placed in possession of the land by John Handley in the year 1884. This deposition of Harman was taken on the 10th day of January, 1899, and he testifies that he "saw Handley in this country about six or seven or eight years" before the taking of the deposition. Harman states that Taylor Payne, Henry Allen, and James Payne were living and remained on the land from 1881 or 1882 to 1893, and that they first claimed under Fuller, and afterwards under Handley. He also testifies that he was agent for Handley, had frequent communications with him by letter, and paid taxes for him on the land. D. H. Harman, Jr., testifies that he knew Taylor Payne and James L. Payne, and that they both lived on the 15,000 acres claimed by Fuller; that Taylor Payne told him he lived there under John Handley, and that Taylor Payne had cleared "quite a good lot of land,—fifteen or twenty acres"; and that he was living there when he (the witness) made the survey of the 15,000 acres with D. H. Harman, Sr. W. Taylor Payne states that he purchased the land where he resides from James L. Payne about 9 or 10 years prior to March 1, 1892, as appears by his affidavit of that date. He denies in that affidavit that he ever held this land, or any other land, under either Fuller, Handley, Lansburgh, or any other party, since he purchased it. This claim of title upon the part of Payne to the land which he purchased, and upon which he lived, was an assertion of his own right to the land, and a disavowal of any other claim of title,

either under Handley or Fuller, and overthrows the statement of Harman that Payne ever held possession of that land under Fuller or Handley. The court treats this affidavit as the declarations of a man, who lived upon the land at the time, as to how he claimed it. Harman's evidence does not disclose any agreement, either verbal or in writing, between Fuller and Payne, whereby Payne agreed to become the tenant of Fuller. His evidence does not show that there was any agreement for a specific time, nor the boundaries of the land that he was to hold, and the most that can be said of it is that it was a declaration upon the part of Payne that he would become his agent. It must be apparent to every one that, if Fuller understood that Payne was to be his tenant for the purpose of holding the land, there would have been a term of years agreed upon, and that the boundaries of the tract of land that he was to hold should have been stated in the agreement, so as to locate the land that Fuller laid claim to. The statement of Harman, contradicted as it is by Taylor Payne, is unsatisfactory. It does not of itself disclose such a possession as the law defines to be an adverse possession. James L. Payne, according to his evidence, had lived upon the land for upwards of 20 years, at the time of the taking of his deposition, as a roving squatter; having lived at three different places upon the land. He states that some 17 or 18 years before January 10, 1899 (the time of the taking of his deposition), a man by the name of Silkman came along, claiming to represent Fuller, before Fuller had sold to Handley, and that Silkman told him to remain upon the land, "to cut where he pleased, and build where he pleased, and to hold possession for him." This is what Harman refers to when he states that Fuller placed James L. Payne upon the land. Payne did not remain at the point he was living when Silkman told him to remain there and hold possession for him, nor does he state that he agreed to remain there as a tenant of Fuller. He left the place where he and Silkman had this conversation, and went to other places, which he supposes were on the 15,000-acre tract; but on cross-examination he admits that he does not know where the boundaries of the 15,000-acre tract are, and that the other places he moved to had been occupied by parties who were squatters, whose rights he purchased, and who were not claiming under anybody but themselves. His evidence is very unsatisfactory, but if he had taken possession under Silkman, as the agent of Fuller, that possession was interrupted and broken when he left the place upon which he was then living, and went to other places. It is to be observed that his testimony merely says that Fuller told him "to hold possession for him," and to "cut where he pleased and build where he pleased." There was no understanding between them as to the terms upon which he was to hold possession of the land for him, nor the time that he was to hold it. In fact, nothing passed between the parties so as to create a legal relation of landlord and tenant. The witness states that he sold his improvement that he made on the 15,000 acres to Taylor Payne, but denies having sold the land; but his deed made on the 24th day of October, 1891, shows that he sold 325 acres of land, by metes and bounds, to W. T. Payne, "to have and to hold all the

above-described land, with its appurtenances, with covenants of special warranty, forever." This deed is an assertion upon his part of a right to the land and of his right to dispose of it; for he makes an absolute conveyance of it, and contradicts his statement that he claimed under Judge Handley, and that he never had any other claim. It does not appear that he had any written agreement with Handley, as his tenant. He does not disclose that he ever had a conveyance from Handley for this land, and yet he makes an absolute conveyance of it. He states that the understanding between him and Silkman, as the agent of Fuller, whatever it was, was a verbal one; but the statement that he makes in the first part of his deposition is that he was merely requested to hold possession,—"to cut where he pleased and build where he pleased,"—and there was no agreement entered into at that time that he would hold possession for Fuller, and become his tenant of the property. This witness (James L. Payne) made an affidavit before a notary public on the 20th day of February, 1892, after he had made the deed to W. T. Payne, and long before he gave his deposition in this case, in which he stated that he purchased the land he sold to Taylor Payne from Albert Payne; that he never claimed title to or possession of said land under any person called Fuller; that he had lived upon the land, prior to selling it to Taylor Payne, about 14 years, and he gave Taylor Payne possession of the land a short time after he purchased it, and made him a deed of the said land; that he purchased the improvement from one James Cooper, and took possession of it in his own right, and not under the right, title, or claim of Fuller, Handley, or any other party. This evidence of James L. Payne is contradictory, and of an unsatisfactory character. He even states that he does not remember of having sold the land to Taylor Payne, but merely the improvement. His affidavit made in 1892, when he had no motive or interest other than to state what the exact facts were in relation to his claim of title of the land, and how he held it, tends to contradict the statement that he did not sell the land to Taylor Payne. It is apparent to my mind that some unusual influence had been brought to bear upon Mr. James L. Payne which led him to make the statements he did in his deposition taken in this case. First. He states that he never held under anybody, and then he says afterwards that he held under Handley. Second. He states that he never sold the land to anybody, but sold the improvement; but, when he was confronted with his deed, it is shown that he sold the land by metes and bounds. Third. He states in his affidavit taken in February, 1892, that he purchased the property of one James Cooper, and took possession of it in his own right, and not under the right, title, or claim of Fuller, Handley, or any one else; and yet in his deposition taken as late as 1899 he contradicts all these statements. What credit can a court give to a witness who makes the reckless statements that James L. Payne does in his deposition, which are contradicted by his previous declarations as to how he held the property, and by record evidence of the fact, showing that at no time, up to the date of the giving of his deposition, had he ever held the property either as a tenant of Fuller or Handley?

Henry Allen testifies in his deposition that a man by the name of Webster came to see him while he was living on the 15,000-acre tract of land, and about 15 or 16 years before the taking of the deposition, in January, 1899, and asked him to become the tenant of Handley. He says this conversation took place in the year 1884; that Webster told him to stay on the place until he turned him off, and, if he did not turn him off, to stay right there, and he had been on the land ever since that conversation occurred between them, but he moved from the place where this conversation took place, and where he had lived, and went down to another point on the land, some two or three miles away. Since the making of the agreement with Webster, he says, he has claimed under Fuller. This man seems to be another roving squatter. If there was any contract at all between him and Webster, it did not assume such a form as to create the relation of landlord and tenant. All Webster said was that he wanted Allen to stay on the place until he (Webster) turned him off. He had no understanding with him as to the extent of his lease, if it could be called a lease,—whether it was confined to the very small piece that he was living on, or whether he was to hold possession of the whole 15,000 acres, and to live there, or the length of time, or anything. It was a very indefinite arrangement, if it was an arrangement at all. It amounted simply to little or nothing. It does not appear that Allen ever saw this man Webster afterwards, nor does it appear in the testimony that he ever saw Judge Handley or his agent after Handley purchased the land. He did not even know at the time he had this conversation with Webster whether he was on what was afterwards known as the "Handley Tract." All he knew was that Webster said that Fuller claimed the land. The witness Allen states in his deposition, in answer to question 10, that Webster represented Judge Handley; but in reply to question 13 he states that he was claiming under Fuller. Plaintiffs' counsel asked him, in his fifteenth interrogatory, "Did you, or not, agree with Webster to take and hold said land as his tenant or the tenant of Fuller, or did you merely agree to hold such land for a short time?" and his reply was, "We didn't set no time. He just told me to stay on until he put me off." This is the only evidence tending to show the relation of landlord and tenant between Allen and Handley and those under whom he claims. As I have before said, it lacks every element of a contract creating a relation of that character.

The next witness for the plaintiffs is Mr. William P. Payne, a lawyer who lived in McDowell county, W. Va., up to February, 1898, and who was retained by Judge Handley in 1892 and 1893 as his counsel in connection with the 15,000-acre tract of land. He knew Webster, and the last time he saw him was in April, 1892. The testimony of this witness refers to leases to be drawn in connection with the tract of land, but those leases were all drawn in 1892, 1893, and 1894. In this connection there are three leases offered,—one dated the 12th day of April, 1892, signed by W. T. Payne; another dated the 10th day of February, 1893, signed by W. T. Payne; and another dated the 3d day of February, 1894, signed by W. T. Payne. These leases purport to be leases for the 15,000 acres of land, and

recognize the title of John Handley to it. This is the first time in the history of the possession of this property that any evidence has been presented to the court which tends to show a contract between the claimants of this land and the parties upon the land whom the plaintiffs claim to be their tenants. It is a little remarkable that, in the history of this title, gentlemen of the experience of Judge Handley and those who represented him should have relied upon merely verbal instructions and directions that they gave all those parties who they claimed were tenants upon the land, without ever having reduced the agreement to writing, so as to clearly define the contract of lease between them and the owners of the 15,000 acres. A fair inference from this fact is that up to the time of these leases there was no established relation of landlord and tenant existing between the Paynes and Allen and Handley and those under whom he claims. When we look at the evidence of W. T. Payne, who says that he bought the place where he lived from his brother, and that about the time he purchased it Webster came along, professing to be acting for Handley, and that Webster told him to stay on the land and hold possession for Judge Handley, we find that he did not fix any time, nor was there any consideration agreed upon. He says that a part of the time he was on the land he held it for himself, but that since 1892 he has been holding it for Handley; that when he purchased it of his brother he considered the property as his own, and did not hold it as the tenant of any one until he executed the lease of April 12, 1892, with Handley. This is the substance of the evidence for the plaintiffs in this connection.

The defendant took the deposition of Walter L. Taylor, who speaks of the affidavits of James L. Payne and W. Taylor Payne, which are filed as exhibits in this case, and states that those affidavits contain, as he now recollects, the facts as he learned them from conversation with affiants when the affidavits were taken.

This is all the evidence of both the plaintiffs and defendant that tends to throw any light upon the subject of the possession under a color or claim of title by Handley. It must be obvious that there is no such possession as the law requires, upon which to found an adverse title or adverse possession to establish a rightful title to this land under a color and claim of title. The chain of title in Landsburg is complete, from the commonwealth down. To enable the plaintiffs in this cause to maintain their action, and to defeat the defendant's right to the lands in controversy, there must be open, notorious, continuous, and unbroken possession for a period of 10 years prior to the institution of the suit. The evidence does not disclose the fact that any of the claimants to this land were ever upon the land for a period of 10 years prior to the institution of this suit, claiming and holding the lands as their own, or that they put tenants in possession who held continuous possession of it for them. The Paynes and Allen, who were upon it in the first instance, were all squatters, and stayed there asserting a right and claim to the land. They never did enter into any contract, either in writing or by parol, so far as the evidence in this case discloses, that created the relation of tenant under either Fuller or Handley. All that Webster

did as the agent of either of these parties was to say, "Stay there and hold it until I tell you to get off." The mere fact of telling a man to stay upon a piece of land does not prove that he remained there as a tenant under the party he represented. If these parties had intended to become the tenants of Fuller or Handley, why did not Webster have them enter into a written agreement to hold possession of the property for Fuller or Handley, as Handley and his executors in 1892, 1893, and 1894 did with the Paynes? The fair and legitimate inference from all this proof is that at the time Webster was there he was unable to have these parties enter into an agreement to become the tenants of Fuller or Handley. The suit was brought in 1898. There is no continuous possession, as disclosed by the evidence in this case, of the plaintiffs in this action by their tenants. There is no continuous possession, as disclosed by the evidence in this case, of the tenants of the plaintiffs in this action for the period prescribed by the statutory bar. It is alleged that the deed made by Spracher, a commissioner of the circuit court of Tazewell county, Va., conveying the 50,000 acres of land to Landsburg, is illegal, but not void, but gives color of title to the said Landsburg. I do not concur in this position. I think the deed is not illegal, but, if it were, it is not void, and does not break the continuity of the title from the commonwealth of Virginia to Lansburgh. For the reasons assigned, I am of opinion to dismiss this bill.